**'08 CIV 4544** COPY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOCELYN BOSTON, on Behalf of All Others Similarly Situated, | Civil Action No.: |
| Plaintiff, | |
| -against- | |
| SLM CORP., ALBERT L. LORD, CHARLES ELLIOTT ANDREWS, JOHN F. REMONDI, ROBERT S. AUTOR, SANDRA L. MASINO, ANTHONY P. TERRACCIANO, ANN TORRE BATES, WILLIAM M. DIEFENDERFER III, DIANE SUITT GILLELAND, EARL A. GOODE, RONALD F. HUNT, MICHAEL MARTIN, BARRY A. MUNITZ, HOWARD NEWMAN, A. ALEXANDER PORTER JR., FRANK PULEO, WOLFGANG SCHOELLKOPF, STEVEN L. SHAPIRO, BARRY L. WILLIAMS, JOHN DOES 1-11 (BEING CURRENT AND FORMER MEMBERS OF THE PLAN ADMINISTRATIVE COMMITTEE OF SLM CORP.) and JOHN DOES 11-20 (BEING CURRENT AND FORMER MEMBERS OF THE PLAN INVESTMENT COMMITTEE OF SLM CORP.), | CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA |
| Defendants. | |



Plaintiff Jocelyn Boston, individually and on behalf of all other persons similarly situated, alleges the following based upon the investigation by Plaintiff's counsel, which included, *inter alia*, a review of public documents filed by SLM Corp. ("SLM," "Sallie Mae" or the "Company") with the United States Securities and Exchange Commission ("SEC") and the United States Department of Labor ("DOL"), conference calls and announcements made by Defendants, securities analysts' reports, wire and press releases published by and regarding the Company, and other publicly available information.

## INTRODUCTION

1.      This is a class action brought pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), on behalf of the Sallie Mae 401(k) Savings Plan (the "Sallie Mae Savings Plan") and the Sallie Mae DMO 401(k) Savings Plan (the "Sallie Mae DMO Savings Plan"), (collectively, the "Plans"), against the Plans' fiduciaries, including Sallie Mae.

2.      Plaintiff alleges that Defendants, as fiduciaries of the Plans, breached their duties to him and to the other participants and beneficiaries of the Plans in violation of ERISA, particularly with regard to the Plans' holdings of Sallie Mae stock.

3.      During the Class period (as defined below), Defendants knew or should have known that Sallie Mae stock was an imprudent investment alternative for the Plans. Defendants had intimate knowledge of, and an active role in, the improper business activities that allowed Sallie Mae to artificially inflate and manipulate the Company's earnings.

4.      This action seeks relief on behalf of the Plans, for losses to the Plans, for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3)), Plaintiff seeks other relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

5.      Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the Plans, Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plans during the Class Period.

## JURISDICTION AND VENUE

6.    **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

7.    **Personal Jurisdiction.**  ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  As all Defendants are either residents of the United States or subject to service in the United States, this Court has personal jurisdiction over them.

8.    **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

## PARTIES

### A.    Plaintiff

9.    Plaintiff was, and continues to be, a participant or beneficiary of the Sallie Mae Savings Plan, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).

### B.    Defendants

#### *Sallie Mae Defendants*

10.    **Defendant Sallie Mae** is a Delaware corporation, with its principal executive offices located at 12061 Bluemont Way, Reston, Virginia, 20190.  Sallie Mae is engaged in the business of providing education finance in the United States.  The Company is the nation's leading provider of student loans and administrator of college savings plans, managing student loans for nearly 10 million customers, and administering college savings accounts for 1 million customers through its subsidiary, Upromise, Inc ("Upromise").  Sallie Mae employs approximately 12,000

individuals at offices nationwide.  During the Class Period, Sallie Mae common stock traded on the New York Stock Exchange.

11.     Sallie Mae is the Plans' Sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), and as such, exercises discretionary authority with respect to the management and administration of the Plans and/or management and disposition of the Plans' assets.  Sallie Mae, at all times, acted through its officers, directors and employees, including members of the Board of Directors' Compensation and Personnel Committee (the "Compensation Committee"), the Plan Administrative Committee (the "Administrative Committee") and the Plan Investment Committee (the "Investment Committee") who were appointed by the Company to perform Plan-related fiduciary functions, and did so in the course and scope of their services for the Company.

12.     Sallie Mae had, upon information and belief, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities. Through its Board of Directors (the "Board"), or otherwise, Sallie Mae had the authority and discretion to hire and terminate said officers and employees.  Sallie Mae also had the authority and discretion to appoint, monitor and remove officers and employees from their individual fiduciary roles with respect to the Plans.

13.     Additionally, by failing to properly discharge their fiduciary duties under ERISA, the officer, director, and employee fiduciaries breached duties they owed to the Plans' participants and their beneficiaries.  Accordingly, the actions of the Plans' officers, directors, and other employee fiduciaries are imputed to Sallie Mae under the doctrine of *respondeat superior*, and Sallie Mae is liable for these actions.

14.    **Defendant Albert L. Lord** ("Lord") has served, at all relevant times, as Vice Chairman of the Board and Chief Executive Officer ("CEO") of Sallie Mae.  Lord also served as the Chairman of the Board from March 2005 to January 2008.  Lord signed Sallie Mae's relevant SEC filings during the Class Period, participated in the day-to-day management and overall direction of the Company, participated in the preparation of the statements alleged herein to be false, and communicated both directly and indirectly with the Plans' participants.  Lord was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition.

15.    **Defendant Charles Elliott Andrews** ("Andrews") has served as the President of Sallie Mae since December 2007.  Andrews also served as the Chief Financial Officer ("CFO") of Sallie Mae from February 2006 to January 2008.  From May 2007 until December 2007, Andrews additionally served as the CEO of the Company.  Andrews signed Sallie Mae's relevant SEC filings during the Class Period, participated in the day-to-day management and overall direction of the Company, participated in the preparation of the statements alleged herein to be false, and communicated both directly and indirectly with the Plans' participants.  Andrews was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition.

16.    **Defendant John F. Remondi** ("Remondi") has served as Vice Chairman and CFO of Sallie Mae at all relevant times.  Remondi is charged with overseeing all of the Company's business strategy and is responsible for corporate finance, investor relations, accounting and reporting, financial planning, credit policy and risk management.  Remondi signed Sallie Mae's relevant SEC filings during the Class Period, participated in the day-to-day management and overall direction of the Company, participated in the preparation of the

statements alleged herein to be false, and communicated both directly and indirectly with the Plans' participants. Remondi was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition.

17.    **Defendant Robert S. Autor** ("Autor") has served at all relevant times, as the Company's Executive Vice President of Operations and Technology. Autor leads Sallie Mae's loan origination, servicing and call center operations, as well as the Company's information technology division and the corporate procurement function. Autor also runs Sallie Mae's guarantor services business and is responsible for Sallie Mae's financial institution sales organization. Autor signed Sallie Mae's relevant SEC filings during the Class Period, participated in the day-to-day management and overall direction of the Company, participated in the preparation of the statements alleged herein to be false, and communicated both directly and indirectly with the Plans' participants. Autor was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition.

18.    **Defendant Sandra Masino** ("Masino") has served at all relevant times, as the Company's Senior Vice President of Education Loan Operations Management. Masino is charged with overseeing the company's operational, support and analytic functions of the education loan product teams. Masino signed Sallie Mae's relevant SEC filings during the Class Period, including the Company's Forms 11-K, participated in the day-to-day management and overall direction of the Company, participated in the preparation of the statements alleged herein to be false, and communicated both directly and indirectly with the Plans' participants. Masino

6

was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition.

### *Director Defendants*

19.    **Defendant Anthony P. Terracciano** ("Terracciano") has served as the Chairman of the Board since January 7, 2008.

20.    **Defendant Ann Torre Bates** ("Bates") has served as a director of Sallie Mae since July 31, 1997.

21.    **Defendant William M. Diefenderfer III** ("Diefenderfer") has served as a director of Sallie Mae since May 20, 1999.

22.    **Defendant Diane Suitt Gilleland** ("Gilleland") has served as a director of Sallie Mae since March 25, 1994.

23.    **Defendant Earl A. Goode** ("Goode") has served as a director of Sallie Mae since July 31, 2000.

24.    **Defendant Ronald F. Hunt** ("Hunt") has served as a director of Sallie Mae since July 5, 1995.

25.    **Defendant Michael Martin** ("Martin") has served as a director of Sallie Mae since March 20, 2008.

26.    **Defendant Barry A. Munitz** ("Munitz") has served as a director of Sallie Mae since July 31, 1997.

27.    **Defendant Howard Newman** ("Newman") has served as a director of Sallie Mae since March 31, 2008.

28.    **Defendant A. Alexander Porter, Jr.** ("Porter") has served as a director of Sallie Mae since July 5, 1995.

29.    **Defendant Frank Puleo** ("Puleo") has served as a director of Sallie Mae since March 20, 2008.

30.    **Defendant Wolfgang Schoellkopf** ("Schoellkopf") has served as a director of Sallie Mae since July 31, 1997.

31.    **Defendant Steven L. Shapiro** ("Shapiro") has served as a director of Sallie Mae since July 5, 1995.

32.    **Defendant Barry L. Williams** ("Williams") has served as a director of Sallie Mae since July 31, 2000.

33.    **Defendants Lord, Terracciano, Bates, Diefenderfer, Gilleland, Goode, Hunt, Martin, Newman, Munitz, Porter, Puleo, Schoellkopf, Shapiro** and **Williams** shall be referred to collectively herein as the Director Defendants.

34.    The Board, upon information and belief, has primary fiduciary oversight of the Plans.  The Director Defendants are fiduciaries of the Plans within the meaning of ERISA in that they exercise discretionary authority with respect to: (i) the management and administration of the Plans; and/or (ii) the management and disposition of the Plans' assets; and/or (iii) appointing, monitoring and removing the Plans' fiduciaries.

35.    Because of the Director Defendants' position, they knew the adverse non-public information about the business of Sallie Mae, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

36.     During the Class Period, the Director Defendants participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

### *The Compensation Committee Defendants*

37.     **Defendant Goode**, in addition o being a member of the Board, served as the Chairman of the Compensation Committee, at all relevant times.  As such, Defendant Goode was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

38.     **Defendants Gilleland, Munitz, Schoellkopf and Shapiro**, in addition to being members of the Board, served as members of the Compensation Committee, and as such were fiduciaries of the Plans within the meaning of ERISA, in that they exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

39.     In addition to the Board collectively, the Compensation Committee, upon information and belief, is also a fiduciary of the Plans.  According to the Compensation Committee's charter, available on Sallie Mae's corporate website, the Compensation Committee is charged with, *inter alia*, "assisting the Board in fulfilling its responsibilities to human resources, compensation and benefit matters concerning the Corporation and its subsidiaries."

40.     Under its charter, the Compensation Committee is entrusted to:

> Consider and make recommendations to the Board with respect to compensation and other benefits for members of the Board.

*** 

9

Recommend to the Board any incentive-compensation and equity-based plans, and review other compensation and benefit programs and policies of the Corporation.

41.     The Compensation Committee and its members therein are fiduciaries of the Plans within the meaning of ERISA in that they exercise discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.   Further, each member of the Compensation Committee, by virtue of their committee position, was a member of the Board and therefore also had fiduciary responsibility to the Plans and their participants in that regard.

### *Administrative Committee Defendants*

42.     **Defendants John Does 1-10 (the "Administrative Committee Defendants")**, at all relevant times, served as members of the Administrative Committee.

43.     At all relevant times, the Administrative Committee Defendants were, upon information and belief, all employees, officers, or directors of Sallie Mae.  The Administrative Committee Defendants were fiduciaries of the Plans within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the Plans' management, administration, investments, and assets.

### *Investment Committee Defendants*

44.     **Defendants John Does 11-20**, at all relevant times, served as members of the Investment Committee of Sallie Mae.

45.     At all relevant times, the Investment Committee Defendants were, upon information and belief, charged with designating investment funds for the Plans, establishing rules and procedures with respect to the Plans' investment funds and monitoring the performance of the Plans' investments. The Investment Committee Defendants were fiduciaries of the Plans

within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the Plans' management, administration, investments, and assets.

## THE PLANS

### A.    Nature of the Plans

46.    The Plans are "employee pension benefit plan[s]" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and defined contribution plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

47.    The Plans are legal entities that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plans are neither plaintiffs nor defendants.  Rather, pursuant to ERISA § 409, 29 U.S.C. §1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plans.  Stated differently, in this action Plaintiff seeks relief that is plan-wide.

48.    The Sallie Mae Savings Plan covers eligible employees of the Company and its subsidiaries, with the exception of participants of the Sallie Mae DMO Savings Plan, who have completed one month of service.  The Sallie Mae DMO Savings Plan covers eligible employees of Sallie Mae's Debt Management Operations who have completed three months of service.

49.    According to the Company's Form 11-K for Sallie Mae Savings Plan, for the fiscal year ended December 31, 2006 (the "Sallie Mae Savings Plan 2006 Form 11-K"), under the terms of the Sallie Mae Savings Plan, the Company can match up to 6% of eligible compensation contributed to the Plan, after one year of service.  These contributions and earnings thereon are vested immediately.

50.    The Sallie Mae Savings Plan 2006 Form 11-K further provides that "[f]or eligible participants who are no longer accruing benefits in the defined benefit plan, the Plan provides for a 2 percent core contribution which is 100% vested after one year of service."[1]

51.    According to the Company's Form 11-K for Sallie Mae DMO Savings Plan, for the fiscal year ended December 31, 2006 (the "Sallie Mae DMO Savings Plan 2006 Form 11-K"), under the terms of the Sallie Mae DMO Savings Plan, the Company makes matching contributions of 100% of a given participant's contributions on the first 3% and 50% on the next 2% of the participant's eligible compensation.  The Company contributions are 100% vested when made.

52.    The Sallie Mae Stock Fund is the principal common stock investment of both Plans.

### B.    Defendants' Fiduciary Status

53.    ***Named Fiduciaries***.  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

54.    ***De Facto Fiduciaries***.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent he or she "(i) exercises any

---

[1]    According to the Company's Definitive Proxy Statement, filed with the SEC on April 10, 2008, "[e]ffective July 1, 2004, the [ ] Plans were frozen with respect to new entrants and participants with less than five years of service.  Effective July 1, 2006, the [ ] Plans were frozen with respect to employees as of June 30, 2004 who had five to nine years of service.  No further benefits will accrue with respect to these participants under the [ ] Plans, other than interest accruals.  Employees as of June 30, 2004 who had ten or more years of service will continue to accrue benefits under the [ ] Plans through June 30, 2009."

discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

55.    Each of the Defendants was a fiduciary with respect to the Plans and owed fiduciary duties to the Plans and the Plans' participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

56.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plans, and the Plans' investments solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

57.    Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

58.    ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still in fact act solely in the interest of participants and beneficiaries, not in the interest of the sponsor. Moreover, all Plans' fiduciaries were obliged,

when wearing their fiduciary hat(s) to act independently of Sallie Mae which had no authority to direct the conduct of any of them with respect to the Plans, the Plans' investments, or the disclosure of information between and among fiduciaries or from fiduciaries to the Plans' participants.

### C.    Defendants' Fiduciary Roles

59.    As previously stated, Sallie Mae is the Plans' Sponsor.

60.    Upon information and belief, the Plans' documents describe Sallie Mae, the Board, the Compensation Committee, the Administrative Committee and the Investment Committee as named fiduciaries of the Plan.

61.    Upon information and belief, instead of delegating all fiduciary responsibility for the Plans to external service providers, Sallie Mae chose to internalize at least some of these fiduciary functions.

62.    Upon information and belief, the Plans and their assets are administered and managed by the Compensation, Administrative and Investment Committees (the "Plan Committees"), selected and monitored by the Board.  The Plan Committees exercised broad responsibility for management and administration of the Plans and, among their other duties, were responsible for oversight of the Plans' investment options, policies, and the performance of the Plans' investments, as well as the review of investment managers.

63.    In their capacity to select and monitor investment options for the Plans, the Plan Committees had the discretion and authority to suspend, eliminate, or reduce any Plan investment, including investments in the Sallie Mae stock.  Upon information and belief, the Plan Committees regularly exercised their authority to suspend, eliminate, reduce, or restructure the Plans'

investments. The Plan Committees also reported to the Board of Directors regarding these duties and the Plans' events pertaining to the same.

64.    Upon information and belief, the Plan Committees exercised responsibility for communicating with participants regarding the Plans, and providing participants with information and materials required by ERISA.   In this regard, on behalf of Sallie Mae and the Director Defendants, the Plan Committees disseminated the Plans' documents and materials.

65.    The Director Defendants are the Plans' fiduciaries to the extent they exercised their authority to select, monitor, retain, and remove the members of the Plan Committees and, accordingly, exercised authority and oversight over the Plan Committees, which reported to the Board regarding the Plan Committees' fiduciary duties and responsibilities to the Plans and with respect to their actions pertaining to the same.

66.     Therefore, the participation in and knowledge of Sallie Mae's inappropriate and potentially unlawful practices by defendants as alleged herein is imputed and attributed to Sallie Mae, the Plan Committees, and the Director Defendants.

## CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

68.    All persons who were participants in or beneficiaries of the Plans at any time during the Class Period, *i.e.*, between January 18, 2007 and the present, and whose accounts included investments in Sallie Mae stock.

69.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and

can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plans during the Class Period.[2]

70.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

71.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

72.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

---

[2]    According to the Company's Form 5500 for Sallie Mae Savings Plan, for the year ended December 31, 2004, there were 6,046 participants of the Plan at the end of the plan year.  According to the Company's Form 5500 for Sallie Mae DMO Savings Plan, for the year ended December 31, 2005, there were 3,530 participants of the Plan at the end of the plan year.

73.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

74.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### I.  Company Background

75.     Sallie Mae, founded in 1972, originates and holds student loans by providing funding, delivery, and servicing support for education loans through its participation in the federal family education loan program ("FFELP") and through offering non-federally guaranteed private education loans.  The Company primarily markets its FFELP Stafford and private education loans through on-campus financial aid offices.  Sallie Mae also engages in asset performance group business, which provides a range of accounts receivable and collections services, including student loan default aversion services, defaulted student loan portfolio management services, contingency collections services for student loans and other asset classes, and accounts receivable

management and collection for purchased portfolios of receivables.  In addition, the Company purchases and manages sub-performing and non-performing mortgage loans.  Further, Sallie Mae provides a range of other financial services, processing capabilities, and information technology to educational institutions, lenders, students and their families, and guarantee agencies.

76.    Sallie Mae offers its loans to students attending both traditional schools and non-traditional schools.  Traditional schools are typically institutions of higher education that are not-for-profit and offer bachelors and graduate degrees.  Non-traditional schools are typically educational institutions that are for-profit and offer associate degrees and/or vocational, career or technical programs.  For-profit schools are institutions that are run by private profit-seeking companies or organizations.  They make up a small segment of students attending colleges and universities.

77.    The graduation rate at the non-traditional schools is much lower than the graduation rate at the typical schools.  Graduation is critical to student loan lenders as graduates tend to earn more and experience lower rates of unemployment than non-graduates, both of which are key factors for borrowers being able to pay back their student loans.  Additionally, the students attending non-traditional schools tend to have a lower tier credit quality and many of them fall into the category of subprime borrowers.

## II. Defendants Failed to Provide Complete and Accurate Information to Plans' Participants Regarding Sallie Mae's Improper Business Activities, While Continuing to Invest the Plans' Assets in Sallie Mae Stock, When It Was No Longer A Prudent Investment for the Plans

78.    During the Class Period, in order to maintain the Company's image as a steady earnings performer and as having strong financial growth, Sallie Mae persistently under-reported various adverse facts regarding its operations, such as the Company's failure to conduct proper due diligence in originating student loans to subprime borrowers, particularly those attending non-

18

traditional institutions; the Company's heavy exposure to defaults related to its non-traditional loan portfolio; the inadequacy of the Company's reserves for uncollectible loans in its non-traditional portfolio, and the high degree of risk posed to the Company's loan origination operations by the deterioration of the subprime loans market.

79.    By at least January 2007, Sallie Mae became aware of the rapidly rising subprime loan delinquencies and the significant losses which it would be forced to eventually recognize on its balance sheet.   Nevertheless, the Company failed to disclose its anticipated subrime loan losses, and instead continually minimized its reportage of the extent of its exposure to the troubled financial markets.

80.    The Class Period starts on January 18, 2007.  On that date, the Company issued a press release entitled "Sallie Mae's fee-based businesses exceed $1 billion; managed loans grow 16 percent to $142 billion. The release stated in part:

- •    Loan Purchases Top a Record $34 Billion
- •    Fee Income Increases 20 Percent
- •    Internal Lending Brands' Growth Rate Exceeds 40 Percent

. . . SLM Corporation, commonly known as Sallie Mae, today reported fourth-quarter and full-year 2006 earnings and performance results that include a total managed student loan portfolio of $142 billion, a 16-percent increase from the year-ago quarter.

"Core earnings" net income was $326 million, or $.74per diluted share, for the 2006 fourth quarter, compared to $284 million, or $.63 per diluted share, in the year-ago quarter. For the full-year 2006, "core earnings" net income was $1.3 billion, or $2.83 per diluted share, up from $1.1 billion, or $2.51 per diluted share, for 2005.  Recognizing stock-based compensation in both the current and year-ago periods and adjusting for one-time items, "core earnings" diluted earnings per share were $.74 in the fourth quarter 2006, a 16-percent increase from $.64 in the year-ago quarter, and $2.79 in 2006, a 17-percent increase from $2.39 in 2005.

"We delivered a record amount of loans to help students access higher education," said Tim Fitzpatrick, CEO. "The private sector, led by Sallie Mae, continues to provide product, pricing and service innovations that deliver results to 80 percent of colleges and universities in the U.S. and help nearly 6 million students access college every year."

\*\*\*

Fourth-quarter 2006 GAAP net income was $18 million, or $.02 per diluted share, compared to $431 million, or $.96 per diluted share, in the year-ago quarter. GAAP net income for 2006 totaled $1.2 billion, compared to $1.4 billion in 2005.

Included in these GAAP results are pre-tax net losses on derivative and hedging activities of $(245) million in the fourth-quarter 2006 and $(339) million year-to-date 2006, compared to pre-tax net gains of $70 million and $247 million in the respective year-ago periods.

81.    On February 1 and 2, 2007, Defendant Lord sold 400,000 shares of stock for an average price of $45.80 per share reaping $18.3 million in insider trading proceeds. This stock sale by Defendant Lord came just days before the public release of President Bush's budget proposal on February 5, 2007. In the President's budget, he proposed cutting student lender rate subsidies and increasing lender risk. The news sent Sallie Mae's shares down 9% in a day. The timing of Defendant Lord's sale prompted separate investigations by the SEC, the U.S. House of Representatives' Committee on Education and Labor and the U.S. Senate Committee on Health, Education, Labor and Pensions.

82.    On April 13, 2007, news surfaced that Sallie Mae was in talks to be bought out by a private equity firm. Three days later, on April 16, 2007, the Company issued a press release entitled "Investor group to buy Sallie Mae for $25 billion," reporting that:

An investor group led by J.C. Flowers & Co. has signed a definitive agreement to purchase SLM Corporation, commonly known as Sallie Mae, for approximately $25 billon or $60.00 per share of common stock, the companies announced today.

When the transaction is complete, J.C. Flowers along with private-equity firm Friedman Fleischer & Lowe will invest $4.4 billion and own 50.2 percent, and Bank of America and JPMorgan Chase each will invest $2.2 billion and each will own 24.9 percent. Sallie Mae's independent board members have unanimously approved the agreement and recommended that its shareholders approve the agreement.

"We are pleased to invest in Sallie Mae and help provide increased liquidity, stability and financial strength," said J. Christopher Flowers, Managing Director at J.C. Flowers. "Both Bank of America and JPMorgan Chase have fully committed to support the company with short-and long-term financing."

The new owners are committed to supporting Sallie Mae's focus on transparency among lenders, schools and students and on corporate governance. Sallie Mae will be subject to oversight by Congress and the Department of Education, and will continue to be subject to all applicable federal and state laws, including the Higher Education Act.

Upon closing, Sallie Mae's current management will continue to lead the company, ensuring that it will continue to adhere to the New York Attorney General's Student Loan Code of Conduct, which Sallie Mae adopted April 11. Sallie Mae will continue to originate student loans under its internal brands and will remain headquartered in Reston, Va.

In 2006, Sallie Mae, the nation's leading saving-and paying-for-college company, originated $23.4 billion of student loans.

"This is an exciting, new chapter in Sallie Mae's history," said Sallie Mae CEO Tim Fitzpatrick, who will continue in that role. "Over the years we have worked with Congress and other policymakers to offer innovative products to students, and to address the challenges of college affordability and rising student debt. We have helped meet this challenge by offering industry-leading student loan discounts, introducing innovative technology, and investing in Upromise, which administers college savings plans."

83.    On this news, Sallie Mae's stock increased from the low $40s to the mid-$50s on unusually high volume.

84.    On April 24, 2007, the Company issued a press release entitled "SLM Corporation's portfolio of managed loans grows 18 percent in first-quarter 2007," reporting that:

- Loan Purchases Up 45 Percent
- Internal Lending Brand Originations Increase 35 Percent
- Direct-to-Consumer Private Education Loans Increase 64 Percent

. . . SLM Corporation, commonly known as Sallie Mae, today reported first-quarter 2007 earnings and performance results that include an 18-percent increase in the managed student loan portfolio to $150 billion from the year-ago quarter's $127 billion. Also during the quarter, the company originated $4.8 billion through its internal lending brands, a 35-percent increase over the year-ago period.

"Our recent acquisition announcement reaffirms and strengthens our commitment to invest in the next generation of America's students," said Tim Fitzpatrick, chief executive officer.  "We remain focused on doing what we do best: providing access to education savings and low-cost financing together with the best information resources to help students pay for college."

The company purchased $11.6 billion in education loans during the first-quarter 2007, a 45 percent increase from the year-ago period. Also during the 2007 first quarter, the company originated $8.0 billion in preferred-channel loans. Approximately 60 percent of all preferred-channel loans originated in the first quarter 2007 were originated by the company's internal lending brands, compared to 47 percent in the year ago period. Preferred-channel loan originations include loans originated by the company's internal lending brands and external lending partners.

Private education loan originations, a segment of preferred-channel originations, were $2.4 billion, and included more than $241 million of direct-to-consumer loans, a 64-percent increase from $147 million of private education loans originated through this channel in the year-ago quarter.

\*\*\*

Sallie Mae reported first-quarter 2007 GAAP net income of $116 million, or $.26 per diluted share, compared to $152 million, or $.34 per diluted share, in the year-ago period. Included in these GAAP results are pre-tax losses on derivative and hedging

activities of $(357) million, compared to $(87) million in the year-ago quarter, servicing and securitization revenue of $252 million, compared to $99 million in the year-ago period, and a provision for losses of $150 million, compared to $60 million in the year-ago period.

"Core earnings" net income for the quarter was $251 million, or $.57 per diluted share, compared to $287 million, or $.65 per diluted share in the year-ago quarter.   These results include a provision for losses of $199 million in the first-quarter 2007, compared to $75 million in the first-quarter 2006.  Annualized net charge-offs as a percentage of average private education loans in repayment were 3.4 percent in the first quarter of 2007, compared to 1.3 percent in the year-ago period.

85.    On May 25, 2007, Sallie Mae filed its Preliminary Proxy Statement relating to the merger. Pursuant to the Proxy Statement, the Company disclosed that its officers and directors had certain interests in the merger that were different from the interests of the Company's shareholders, including the potential to receive large cash payments upon consummation of the merger and indemnity agreements which would protect the executives from past misconduct.  The cash payments were to be based upon the conversion of the officers' and directors' equity interests in the Company at the effective time of the merger which included the automatic vesting of all outstanding stock options.  At the time of the merger, Defendant Lord was to receive a cash payment of approximately $225 million, Defendant Andrews was to receive $16.1 million and Defendant Autor was to receive $16 million.

86.    On July 11, 2007, the Company issued a press release entitled "SLM Corporation provides update on transaction," reporting that:

SLM Corporation, commonly known as Sallie Mae, today announced that, in connection with the April 15, 2007 agreement providing for the acquisition of Sallie Mae, the acquiring entity, owned by affiliates of J.C. Flowers & Co., Bank of America and JPMorgan Chase, has informed Sallie Mae that it believes that current legislative proposals pending before the U.S. House of Representatives and U.S. Senate "could result in a failure of the

conditions to the closing of the merger to be satisfied." Sallie Mae strongly disagrees with this assertion, intends to proceed towards the closing of the merger transaction as rapidly as possible and will take all steps to protect shareholders' interests.

87.    Upon this news, Sallie Mae's stock price retreated to the low $50s. Nonetheless, Sallie Mae maintained that the new legislation would not have a meaningful impact on its business operations.

88.    On July 17, 2007, the Company issued a press release entitled "Sallie Mae's managed loan portfolio grows 18 percent from prior year to $153 billion in second-quarter; Originations through Company's lending brands grow 39 percent," reporting that:

> SLM Corporation, commonly known as Sallie Mae, today reported second-quarter 2007 earnings and performance results that include an 18-percent increase in managed student loans from the year-ago quarter, with the company's portfolio topping $153 billion. Second-quarter 2007 preferred-channel loan originations were $3.6 billion, and loans originated through the company's internal brands, a segment of total preferred-channel loan originations, grew 39 percent from the year-ago period to $2.4 billion.
>
> Preferred-channel loan originations include loans originated by the company's internal lending brands and external lending partners. Preferred-channel originations in the first half of 2007 were $11.6 billion, and internal brands originated $7.2 billion, or 62 percent, of the total.
>
> "Our loan portfolio continues to register strong growth, and our internal brands are outpacing the market," said C.E. Andrews, chief executive officer. "We are delivering best-in-class products and services to schools, students and families to help them access higher education."
>
> The company purchased $20.9 billion in education loans in the first half of 2007, a 27-percent increase from the same period last year. In the second-quarter 2007, loan purchases were $8.4 billion.
>
> ***
>
> Sallie Mae reported second-quarter 2007 GAAP net income of $966 million, or $1.03 per diluted share, compared to $724 million,

or $1.52 per diluted share, in the year-ago period. Included in these GAAP results are pre-tax gains on derivative and hedging activities of $822 million in the second-quarter 2007, compared to $123 million in the year-ago quarter, and a decrease of $671 million in gains on student loan securitizations. Second-quarter 2007 GAAP diluted earnings per share were reduced by $1.21 due to the reversal of unrealized gains on dilutive outstanding equity-forward contracts as required by the GAAP diluted earnings per share calculation.

"Core earnings" net income for the second-quarter 2007 was $189 million, or $.43 per diluted share, down from $320 million, or $.72 per diluted share, in the year-ago quarter. These second-quarter 2007 results include a provision for losses of $247 million and $51 million in expenses related to the company's previously announced acquisition. Annualized net charge-offs as a percentage of average private education loans in repayment were 3.5 percent in the second-quarter 2007, compared to 3.4 percent in the prior quarter. For the first half of 2007, "core earnings" net income was $440 million, compared to $607 million in the first half of 2006.

89.     Subsequently, throughout the fall of 2007, the acquisition deal began to collapse as the buyer group refused to consummate the merger per the original terms of the merger agreement due to the recent change in legislation and the turmoil in the credit market.

90.     On October 11, 2007, the Company issued a press release entitled "Sallie Mae student loan originations increase 13-percent from year-ago quarter; Managed student loan portfolio reaches $160 billion," reporting that:

> SLM Corporation, commonly known as Sallie Mae, today reported third-quarter 2007 earnings and performance results that include a 13-percent rise in its student loan originations to $8.9 billion, from the 2006 third quarter's $7.8 billion. Year-to-date 2007, student loan originations were $20.5 billion, compared to $18.6 billion in the same period last year. The company's managed student loan portfolio totaled $160 billion at the end of the third-quarter 2007.

> "Thanks to our industry-leading brand, our scale and efficiencies, and our focus on students and families, we successfully faced a number of challenges this quarter," said C.E. Andrews, chief executive officer. "We have a solid track record of growing our 'core earnings' through various political, interest rate and

economic environments, and the fundamentals of our business point to a bright future for our company."

\*\*\*

Sallie Mae reported a third-quarter 2007 GAAP net loss of $344 million, or $.85 diluted loss per share, compared to net income of $263 million, or $.60 per diluted share, in the year-ago period. Included in these GAAP results are pre-tax losses on derivative and hedging activities of $487 million in the third-quarter 2007, principally related to the decline in share price during the quarter on the company's equity forward positions.

Third-quarter 2007 "core earnings" net income was $305 million, or $.70 per diluted share, before $46 million, or $.11 per diluted share, in after-tax reductions to net income from the following non-recurring items: $28 million related to the recent legislative changes in the FFELP risk-sharing percentage and $18 million related to the company's previously announced merger agreement. Including these non-recurring items, reported "core earnings" net income was $259 million, or $.59 per diluted share.

For the first nine months of 2007, "core earnings" net income was $699 million, compared to $927 million in the same period last year.

91.     Throughout November 2007, Sallie Mae's stock continued to slide downward from the mid-$40s range at the beginning of the month to mid to upper $30s by the end of the month as the market began to learn the extent to which both the deterioration in the credit market and the new legislation would negatively affect Sallie Mae's operations.

92.     On December 12, 2007, the Company issued a press release entitled "SLM Corporation provides update of transaction and financial outlook," reporting the following:

SLM Corporation, commonly known as Sallie Mae, today announced the following:

To address recent reports in the marketplace regarding the proposed buyout of Sallie Mae by a group led by J.C. Flowers, Bank of America and JP Morgan Chase, the company's Board of Directors states the following:

Over the past eight weeks, in a series of discussions between the company and senior representatives of the Flowers group, Sallie Mae has indicated that, to resolve the dispute between the parties, the company offered to consider an alternative transaction with the Flowers group, and to give them the opportunity to update their due diligence and submit a new proposal to acquire the company with no pre-conditions.

The buyer's group has indicated to Sallie Mae that it does not wish to pursue these opportunities.

The Board remains committed to protecting the rights of our shareholders, and will pursue all available recourse, including the company's existing lawsuit against the buyer's group.

The company has indications of interest, subject to customary terms and conditions, from 10 financial institutions for new secured warehouse funding significantly in excess of $30 billion.

The company also made the following announcements:

Financial Outlook

The company expects fourth-quarter core earnings per diluted share to be in the range of $.52 to $.57, excluding non-recurring items such as merger-related costs. The fourth quarter core earnings per share are being impacted by funding costs and increased reserves for the FFELP loan portfolio
.
The company will release its private credit trust data on Friday, Dec. 14, which will show an improvement in charge-offs, 90-day and over delinquencies, and forbearances.

The company is lowering its 2008 core earnings EPS guidance from $3.25 to a range of $2.60 to $2.80 due primarily to increased costs from replacing the company's interim funding facility.

The underlying business drivers for the company are strong and executive management is strategically repositioning certain aspects of the business to allow for maximum growth and earnings opportunities.

Equity Forward Contracts

Separately, the company has reduced the strike and trigger prices with its counterparties on equity forward contracts. As a result of

these transactions, the company's aggregate position on equity forward contracts is 48.2 million shares at an average strike price of $43.93, with trigger prices ranging from $26.00 to $19.58.

Executive Reorganization

Barry Feierstein has been promoted to lead sales and marketing. Feierstein, who joined Sallie Mae in 2004, has been responsible for the company's private loan strategy and development. Robert Autor has been appointed to lead the company's originations, servicing and call center operations, in addition to its information technology group. Autor joined the company in 1999 as part of the Nellie Mae acquisition.

Kevin Moehn, executive vice president, sales and originations, and June McCormack, executive vice president, servicing, technology and sales marketing, will be leaving the company.

The Board will continue to work with Sallie Mae's management to generate shareholder value, and to grow the company's industry leadership position.

Additionally, the company will be permitting its directors and executive officers to trade company stock, subject to the company's normal trading clearance procedures. Due to the proposed Flowers transaction, the company had restricted its directors and executives from trading company stock since March 2007.

93.    This was part of a series of partial disclosures and revelations concerning the truth about Sallie Mae's business operations, finances, business metrics, and future business and financial prospects. Nonetheless, Sallie Mae's stock continued to trade at artificially inflated levels as this revelation, along with the ones made during the remainder of the Class Period, was accompanied by denials and continued misrepresentations by Defendants. Upon this partial disclosure, Sallie Mae's stock dropped $3.45 per share on December 12, 2007, to close at $28.49 per share, a one-day decline of 12% on extremely high volume.

94.    On December 13, 2007, the Company issued a press release entitled "SLM Corporation provides update on equity forward contracts," reporting that:

> SLM Corporation, commonly known as Sallie Mae, today announced that the company has amended or closed out certain equity forward contracts. As a result of these transactions, the company's aggregate position on equity forward contracts is 44.0 million shares at an average strike price of $44.30, with trigger prices ranging from $24.75 to $19.58.

95.     On December 14, 2007, Defendant Lord sold 1,265,401 shares of stock for an average price of $27.36 per share reaping $34.6 million in insider trading proceeds. Additionally, director Charles Daley sold 80,023 shares of stock on this day reaping $2.2 million in insider trading proceeds.

96.     In its press release dated December 14, 2007, the Company made the following representations concerning Defendant Lord's stock sale:

> In addition, Sallie Mae announced that Mr. Lord today sold 1.2 million shares of SLM common stock, approximately 10 percent of his equity units, on the open market. This action was required under Mr. Lord's borrowing arrangements. Sallie Mae opened its trading window for directors and executive officers today for the first time since discussions with the J.C. Flowers group in March 2007. After the sale, Mr. Lord owns approximately 340,000 SLM shares and share units, and holds stock options and appreciation rights, at various exercise prices, covering approximately 10 million SLM shares.

97.     The stock sale by Defendant Lord was again fortuitous, as it came days before Sallie Mae would host a conference call in which it would disclose that the Company might be facing higher financing costs and that the Company would need to add capital. Upon this news, Sallie Mae's shares plummeted - closing down 21% in a day. The timing of these stock sales prompted another investigation by the SEC into the Company's disclosures in December 2007, both before and after its executives and directors traded their stock.

98.     On December 19, 2007, *The Wall Street Journal* published an article entitled "Sallie Mae Understated Stock Sale by CEO Lord," reporting that:

Albert L. Lord, chief executive of student-loan titan SLM Corp., or Sallie Mae, sold slightly more SLM stock than the company announced last week.

On Friday, Mr. Lord sold 1,265,401 shares of SLM, or 97% of his company stock, according to filings the company made yesterday with the Securities and Exchange Commission. The sales were at an average price of $27.36 a share.

That was more than Sallie Mae had disclosed, when it announced Friday evening that "Mr. Lord today sold 1.2 million shares of SLM common stock." The company's release also overstated Mr. Lord's remaining holdings.

A Sallie Mae spokesman acknowledged the errors but didn't comment further.

Sallie Mae shares have fallen 40% since the beginning of the year, closing yesterday at $28.87, up 97 cents, in 4 p.m. New York Stock Exchange composite trading.

The company's business has come under pressure since Congress agreed to cut subsidies for student-loan providers. In September, a group led by private-equity firm J.C. Flowers & Co. backed out of an agreement to buy Sallie Mae for $60 a share.

Sallie Mae had also described Mr. Lord's sale as "approximately 10% of his equity units" - meaning if one adds up the total number of Mr. Lord's shares, stock options and other derivatives on a one-to-one basis, the stock sale was of 10% of his total number of Sallie Mae equity instruments.

For almost all of Mr. Lord's stock options, the exercise price is higher than the current share price, making them worthless unless Sallie Mae's share price rises.

Accounting for his various derivatives at their fair values, Mr. Lord's transaction represents the sale of roughly three-quarters of his SLM holdings, said someone familiar with the matter.

99.    On December 19, 2007, on the Company's shareholder conference call, Defendants made the following statements:

[Lord:] Let me first talk about the deal. I'm not going to talk very much about it. As you are well aware, it's not a deal any longer, it's

litigation. I'm going to attempt to engage in a little self-defense, hopefully not defensively. I and the Company and the Board have gotten some bad press for not doing a transaction. I know there are many disappointed recent shareholders. Again, the irony is that my objective over a 30-year career of representing public companies has been to reward investors, particularly in this Company which I hold very dear.

\*\*\*

I'm going to mention a few words about my stock sale. My bank sold me out on Friday of 1.2 million shares. I will mention that it's embarrassing and troublesome to me personally. It is not a sign of my disillusionment with the Company; in fact, the exact reverse is the case. It is a short-term cost in my view of my own belief in my company. I suppose you might say, one more victim of an unfinished deal. I can assure you that I'm properly incented to create the earnings growth that is Company has been known for and I have no more margin stock - no more margin.

\*\*\*

The other immediate goal, and it has already been started by the Company, is to focus directly on the highest quality private credit asset channels. Intermediate goals - intermediate for me means the -I guess we call it the '08 lending season. It begins in the summer of '08, so we're really talking about maybe July. It is at that point I hope we begin to restore a viable long-term earnings growth rate for the Company. We will continue to capitalize on our on-campus strength and build that credit channel. There are numerous opportunities to consolidate the industry. We have to be very discriminating in that effort, but I see massive opportunity for us to increase share. Again, to acquire that capacity, we will likely use stock. We will not do dilutive transactions. We will not increase our goodwill, and these opportunities will be taken also to build capital.

When people think about this Company in terms of its earnings growth rate, and we have had a pretty impressive growth rate for 25 years, it comes down to very simple, simple basics. It's the growth in the number of students, the growth in the cost of schools and our ability to grow market share. Our focus, particularly now in light of events including legislation, will be to focus our growth targets even more directly on the four-year schools where we want to build market share. Sallie Mae has had a strong double-digit growth rate for 25 years. When we first listed this Company in 1983, I was CFO. The success we have earned over that period has

been as a consequence of what I just mentioned - the growth in higher ed, our market share growth. We've achieved those double-digit growth rates in the face of 25 years of margin cuts. This recent round of margin cuts was significant, but is not net. It changes the landscape for us, but if anybody's prepared to deal with that, we are. These macroeconomic facts did not change just because of a failed deal.

\*\*\*

Recently, we restruck or reforecast or reguided or whatever is the language we need to use our fourth quarter earnings and our 2008 outlook. I am being asked why. I'm not going to get precise, but the issue is predominantly funding costs. Our securitization market costs are-out over 25 basis points. Access there is not as free and is not infinite as it once was.  We have discovered an index mismatch between commercial paper on which the student loans earn their interest and LIBOR.   This credit crunch has exposed that mismatch, which had never opened in the roughly 10 years we've had this commercial paper index, but it has widened out into double-digits.  The interim financing facility provided by the buyer has high financing costs. Replacing it will probably involve higher financing costs. This is not a great time to be financing.

We made a decision on the basis of trying to increase market share to - not to knock out our borrower benefits in response to the recent legislation. Original forecast had us knocking borrower benefits out.  There are - and we have moved our private credit provision up a little bit since we have talked to you in October. Since we talked to you in October, this credit crunch reemerged, and - well, so be it.

As I said, I don't want to get into FICO scores and basis points. Steve can help you guys with your models with respect to these issues, and he will. Of course, I hear a lot of questions about private credit quality.  I would direct you to our securitization data, which is actually showing mild improvement. At least on a delinquency data versus prior quarters, it seems to be moving in the right direction.  I am not the least bit Pollyanna-ish because of those numbers. This is a delicate economic environment; at least it seems to be, so we're watching them very closely. I'm pleased they're going in the right direction, but I also would tell you, we are comparing them to first-half statistics which bear the cost of some operational issues and make it a little bit difficult to fully analyze that data.

We have analyzed our defaults and we have a highly sophisticated and professional group of collectors in our collection function and they've analyzed these defaults and we are on them. We have moved quickly to cut off those loans – the most difficult loans – at their source, and I believe we have a very good understanding of that. This is a very high priority of mine in my new seat.

The very good news is that demand for this product is as strong as ever, and it grows. Almost all marginal funding student borrowing is in the private credit area. Almost every student has used up whatever guaranteed loans are available.  So whatever growth and whatever demand increase there is, is typically in the private area. I say that is good news. It gives us the luxury of applying a little more care in the selection of these assets.

I hear noise from a variety of places, some of which make me less than happy about our refinancing our interim facility. That facility comes due in May, although in February it becomes much more expensive.  As I said, there seems to be a lot of interest in this facility.  We need to remember that this is a fully secured facility. And while it is a bad time to be negotiating interest rates, we are very much in the process. We have a great deal of interest in this, and in my view, it's a matter of cost.

The long-term – I think it's worth noting that the Company has never had an interim facility in its 30-year history. This is a byproduct of a deal. The goal will be of course to have backup facilities in sufficient amount long-term, but obviously the long-term goal is, as we've built capital, is to reduce the size of it, and certainly the cost of it.

I have been CEO and CFO of this Company for 24 years. We - I think the largest that that underlying facility had ever been was $6 billion. That would clearly be insufficient today, but this is a unique situation. Our goal, as I said earlier I think, is to build other avenues to move our assets off-balance sheet.

I'm going to wrap up.  As I said, this Company has been around for 35 years.  It has led the financing of higher education for 35 years. The macroeconomics of this industry remain the same. There have been a variety of changes, particularly in the legislative area and in the credit markets underlying all of this, but we're doing about a company that seeks to lead and does lead the higher education finance industry and has been in effect wandering off on a different path for the last nine months now. We need to get off that patch and get back on the right path and get back to the

double-digit earnings growth that we've had in the past. I have had a 26-year – out of the Company's 35 years, I have been associated with it for 26 years. I am extraordinarily proud of it.

This is just one more major challenge for this Company. We will exceed that challenge. There are lots of worriers in this environment.  Just remember, those of you who are worrying, that this business is one of the very few that is not totally recession-proof, but it is virtually recession proof.

100.     Following the Company's conference call, Sallie Mae's stock dropped $5.98 per share, to close at $22.89 per share on December 19, 2007, a one-day decline of 21% on extremely high volume.

101.     On December 20, 2007, *The Wall Street Journal* published an article entitled "Sallie Offers Little on Strategy – CEO, in Investor Call, Fails to Assuage Worry As Shares Slide by 21 %," reporting that:

Sallie Mae's chief executive rattled investors, declining to answer many questions about the student-loan company's finances and strategy amid concern about its prospects in the credit crunch.

After a rambling conference call, which Chief Executive Albert L. Lord ended with an expletive, shares of Sallie Mae, officially SLM Corp., fell $5.98, or 21%, to $22.89 in 4 p.m. New York Stock Exchange composite trading. Mr. Lord said the company is considering raising money to shore up its balance sheet through an offering of common stock, and that Sallie wouldn't consider reinstating its dividend - suspended this year - until mid-2008.

Yesterday's conference call caps a tough autumn for Sallie Mae. Last week, a $25 billion takeover bid by a group of investors, led by private-equity firm J.C. Flowers & Co., came to an end.  The two sides are now locked in litigation about whether the buyout group will have to pay Sallie a $900 million breakup fee. The collapse of the deal, which would have given investors $60 a share, follows the decision by Congress to slash billions of dollars of subsidies to student-loan companies, hurting Sallie's business.

Mr. Lord, after dodging many questions, pledged to answer them at a meeting in January. In an apparent reference to investors' anger, he said: "I can assure you, you will be going through a

metal detector." He ended the conference call by saying "Let's go. There's no questions. Let's get the [expletive] out of here."

Sallie Mae spokesman Tom Joyce called the metal-detector remark "an attempt at humor" and the expletive "an unfortunate slip of the tongue." Mr. Joyce said the call had been intended for Mr. Lord, in his new role, to give investors a "broad overview" of the company's situation.

Mr. Lord, who has been with the company for 26 years, served as chief executive from 1997 to 2005. The company named him CEO again last week, though he had taken over the principal-executive role in November.

Mr. Lord also addressed his recent sale of 1,265,401 shares of SLM, or 97% of his company stock. The company's disclosures suggested he had borrowed against his stockholdings and faced a margin call as the value of his holdings declined. Yesterday, Mr. Lord, who still holds millions of options, said "my bank sold me out" of the shares and called it "embarrassing and troublesome to me personally" and "not a sign of disillusionment with the company."

Mr. Lord, a hard-charging executive known for his brusque manner, is often credited with transforming the company in recent years from a government-sponsored entity into a private firm with fast-growing profits. (Critics said the company was taking advantage of students' ever-higher debts.) "Al's always been a shoot-from-the-hip kind of guy," said Matt Snowling, an analyst at Friedman, Billings, Ramsey & Co., referring to yesterday's conference call. "He shot himself in the foot on this one."

Sallie's travails yesterday show the extreme nervousness of investors about securities backed by financial instruments, such as mortgages and credit cards. Sallie has long prospered because of the robust market for securities backed by student loans, which are guaranteed by the U.S. government.

Yet, Mr. Lord indicated that its costs are rising because investors are nervous even about those securities. Sallie Mae also makes and resells private student loans – which aren't backed by the government. Investors have largely lost interest in those deals, fearing they could be subject to rising defaults.

Sameer Gokhale, an analyst with Keefe, Bruyette & Woods, says he didn't expect students to have trouble getting access to

government-backed student loans. But he and other analysts said private loans – often necessary for students amid spiraling tuitions – may end up being less available and more costly. "One has to wonder who is going to be around to lend money to students on the private-loan side," he said.

102.    Furthermore, due to the utter collapse of the Company's stock price by December 19, 2007, most of the trigger prices as set by the Company's equity forward contracts had been reached – meaning that the Company had lost its bet on its own share value and was required to settle its equity contracts.[3]

103.    As a result, on December 26, 2007, the Company announced a proposed $2.5 billion public offering of common stock and mandatory convertible preferred stock in order to raise the capital required to physically settle its outstanding equity forward purchase contracts. The offering closed on December 31, 2007, resulting in total net proceeds of $2.9 billion.

104.    Subsequently, on January 3, 2008, the Company filed its Form 8-K with the SEC, providing that:

> **Business trends**
>
> On December 12, 2007, we announced that our business has recently been negatively affected as a result of higher funding costs (including the costs of utilizing, and the expected costs of refinancing, the Interim ABCP Facility, defined below), and increased reserves for our Federal Family Education Loan Program ("FFELP") loan portfolio.  In addition, our business has been negatively affected by an index mismatch between the commercial

---

[3]    In an equity forward contract, an issuer sells its securities to a buyer and agrees to repurchase the shares for a greater amount in the future.  The issuer is essentially placing a bet that the price of its shares will rise.  If the market value of the underlying securities falls below certain predetermined "trigger" levels, the buyer of the contract has the right to terminate the contract and settle all or a portion of the original contract price.

As of December 31, 2006, Sallie Mae had outstanding equity forward contracts to purchase 48.2 million shares of its common stock at prices ranging from $46.30 to $54.74 per share with trigger prices ranging from $20.84 to $35.58 per share.  In February 2007, the Company amended its equity forward contracts whereby the trigger prices were reduced with the highest trigger price being $30.11 per share.  As of February 28, 2007, Sallie Mae had outstanding equity forward contracts to purchase 48 million shares of its common stock at prices ranging from $43.50 to $54.74 per share with trigger prices ranging from $23.93 per share to $30.11 per share.  Given the nature of equity contracts, it was imperative that the Company maintain its share price above the predetermined trigger levels throughout the Class Period.

paper rate, the index for determining the interest rate we earn on the vast majority of our FFELP student loan assets, and LIBOR, the index for determining the interest rates on a substantial portion of our debt used to fund these assets.

Our management team is evaluating certain aspects of our business as a response to the impact on our business of The College Cost Reduction and Access Act of 2007 (the "Act"), and current challenges in the capital markets.  The Act has a number of important implications for the profitability of our FFELP business, including a reduction in special allowance payments, the elimination of the "Exceptional Performer" designation and the corresponding reduction in default payments to 97% through 2012 and 95% thereafter, an increase in the lender paid origination fees for certain loan types and reduction in default collections retention fees, and account maintenance fees related to guaranty agency activities. As a result, we expect that the Act will significantly reduce and, combined with higher financing costs, could possibly eliminate the profitability of new FFELP loan originations, while increasing our risk sharing from our FFELP loan portfolio.

In response to the Act and market conditions, we plan to be more selective in pursuing origination activity, in both FFELP loans and private education loans. In addition, we plan to curtail less profitable student loan acquisition activities such as spot purchases and wholesale consolidation loan purchases, which will reduce our funding needs. We expect to see many participants exit the student loan industry in response to the Act as well as current market conditions and we therefore expect to partially offset declining loan volumes caused by our more selective lending policies with increased market share taken from participants exiting the industry. We expect to continue to focus on generally higher-margin Private Education Loans, both through our school channel and our direct to consumer channel, although in the case of the latter, with particular attention to continuing the more stringent underwriting standards that are necessary in this market. We also expect to adjust our private education loan pricing to reflect the current financing and market conditions.  We also plan to eliminate certain borrower benefits offered in connection with both our FFELP loans and our private education loans. We will further de-emphasize pursuing incremental consolidation loans, in particular FFELP consolidation loans, as a result of significant margin erosion for FFELP consolidation loans created by the combined effect of the Act and the increased cost of borrowing in the current capital markets. Nevertheless we will continue our efforts to protect selected FFELP assets existing in our portfolio. We expect

to continue to aggressively pursue other FFELP-related fee income opportunities such as FFELP loan servicing, guarantor servicing and collections.

***

### Forward agreements

The Company intends to use approximately $2.0 billion of the net proceeds from the concurrent offerings described above to settle its outstanding equity forward contract with Citibank, N.A. and repurchase the 44,039,890 shares of common stock deliverable to the Company under the contract. The Company and Citibank, N.A. have agreed to physically settle the contract, and the Company has paid Citibank, N.A. approximately $1.1 billion, the difference between the contract purchase price and the market closing price on December 28, 2007 on the approximate 44 million shares. Consequently, the common shares outstanding on the Company's year-end balance sheet will reflect the shares issued in the public offerings and the physical settlement of the equity forward contract. The Company will pay Citibank, N.A. the remaining balance due under the contract in early January 2008.

### Dividends

We have not paid any dividends on our common stock since the execution of the merger agreement with the Buyer Group in April 2007.  While the restriction on the payment of dividends under the merger agreement has been terminated, we expect to continue not paying dividends in the near term in order to focus on balance sheet improvement and expect to re-examine our dividend policy in the second half of 2008.

### Management changes and sales of securities

On December 14, 2007, we announced that our Board of Directors added the Chief Executive Officer title and responsibilities to our Executive Chairman Albert L. Lord. C.E. Andrews, our previous CEO, assumed the role of President.

On the same date, we announced we had opened our trading window for directors and executive officers for the first time since we commenced discussions with the Buyer Group in March 2007. Mr. Lord sold approximately 1.3 million shares of our common stock, or approximately 97% of the common stock that he owned before the sale, on the open market on December 14, 2007. Also

on December 14, 2007, Mr. Charles Daley, a director, sold approximately 80,023 shares of our common stock or approximately 68% of the common stock that he owned before the sale. Messrs. Lord and Daley have advised us that these actions were required under their respective borrowing arrangements.

105.    On this news, Salle Mae's stock dropped $2.49 per share, to close at $16.67 per share on January 4, 2008, a one-day decline of 15% on volume four-times the average three-month volume. This was the lowest Sallie Mae's stock has traded since October 2000.

106.    The true facts, which were known or should have been known by Defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company failed to engage in proper due diligence in originating student loans to subprime borrowers, particularly those attending non-traditional institutions;

(b)    The Company was not adequately reserving for uncollectible loans in its non-traditional portfolio in violation of GAAP, causing its financial results to be materially misstated;

(c)    The Company failed to disclose known trends and uncertainties as required by SEC regulations concerning collection issues with its non-traditional loan portfolio;

(d)    The Company had far greater exposure to anticipated losses and defaults related to its nontraditional loan portfolio than it had previously disclosed;

(e)    The Company's business model was unprepared for legislative changes that would result in a reduction in federal student lender rate subsidies and an increase in lender risk to a much greater extent than represented by Defendants;

(f)    Given the deterioration and the increased volatility in the subprime market and reductions in federal subsidies, the Company would be forced to tighten its lending standards

on both its federal loans and private education loans which would have a direct material negative impact on its loan originations going forward; and

(g)    Given the increased volatility in the subprime market and reductions in federal subsidies, the Company had no reasonable basis to make projections about its ability to maintain its current student loan production levels or its ability to manage its costs. As a result, the Company's projections issued during the Class Period about its earnings for 2007 were at a minimum reckless.

107.    As a result of Defendants' false statements, Sallie Mae's stock price traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 71 % from their Class Period and near all time high of $57.98 per share in July 2007.

108.    On January 22,2008, Corinthian Colleges, Inc., a for-profit post-secondary education company, filed its Form 8-K with the SEC, providing that:

> Corinthian Colleges, Inc. ("Corinthian," the "Company," "we" or "us") has been informed by Sallie Mae and two other lenders that they will no longer make private loans available for students who present higher credit risks (i.e. subprime borrowers). We understand this change in policy applies to subprime borrowers at post-secondary institutions in general.
>
> Effective October 1, 2007, Congress reduced subsidies for all federal Title IV student financial aid lenders. Those subsidy reductions, coupled with the challenging subprime credit market, have caused lenders to re-evaluate their contractual arrangements with post-secondary institutions, including Corinthian.
>
> The largest of these lenders, Sallie Mae, provided 90% of private loans for Corinthian's students in the United States. Private loans constituted approximately 13% of our U.S. revenue (on a cash basis) in fiscal 2007. On January 18, 2008, we received a letter from Sallie Mae indicating that it was exiting the subprime lending business for private student loans. Thus, effective March 1, 2008, Sallie Mae will no longer provide private loans for Corinthian

students in the subprime credit category. In fiscal 2007, approximately 75% of our private loan portfolio was subprime. We understand that Sallie Mae's intention is to honor its loan obligations to current students; continue providing private loans to students with prime credit scores; and continue providing federal Title IV loans.

109.    Thereafter, other institutions in the for-profit sector, including Career Education Corp. and Lincoln Educational Services Corp., made similar disclosures regarding Sallie Mae's change in policy.

110.    On January 23, 2008, the Company issued a press release entitled "Sallie Mae announces fourth-quarter and full-year 2007 results." The release stated in part:

- Loan Loss Provision Creates Net Loss in Fourth Quarter
- Originations Top $25 Billion

... SLM Corporation, commonly known as Sallie Mae, today reported "core earnings" results that include a fourth-quarter 2007 net loss of $139 million, or $.36 diluted loss per share, and full-year 2007 net income of $560 million, or $1.23 diluted earnings per share.

Student loan originations totaled $5.0 billion in the 2007 fourth quarter and $25.5 billion during the full-year 2007. Student loans originated through Sallie Mae's internal brands, the most profitable segment of total student loan originations, grew 27 percent year over year to $16.6 billion.

The company recorded a loan loss provision of $575 million on a GAAP basis, or $750 million on a "core earnings" basis, in the 2007 fourth quarter that contributed to a net loss for the quarter and reduced earnings for the year. The increase in the provision relates primarily to the actual and expected performance of the non-traditional, higher-risk portion of the company's managed student loan portfolio.

"While there were some bright spots, we are obviously disappointed by our fourth-quarter results overall. Our cost of funds and loan loss expectations were impacted by weakening credit markets," said Albert Lord, chief executive officer. "We faced significant distractions in 2007, but we have taken several of the necessary steps to position the company for a return to strong,

quality asset and earnings growth. Our business trends point in the right direction. In 2007, a challenging year for our industry, we helped students with a record amount of financing to pay for college. In 2008 and beyond, our market leadership position will continue to grow together with the demand for higher education."

***

Sallie Mae reported a fourth-quarter 2007 GAAP net loss of $1.6 billion, or $3.98 diluted loss per share, including a $1.5 billion mark-to-market loss on the company's equity forward contract, which was physically settled in full in January 2008. This compares to net income of $ 18 million, or $.02 diluted earnings per share, in the year-ago period.

The GAAP net loss for 2007 totaled $896 million, compared to GAAP net income of $1.2 billion in 2006. The 2007 GAAP results include principally the forward contract mark-to-market loss and private loan loss provision of $884 million.

Fourth-quarter 2007 "core earnings" net loss was $139 million, or $.36 diluted loss per share, compared to net income of $326 million, or $.74 diluted earnings per share, in the year-ago period. Driving the 2007 fourth-quarter's loss were provisions for loan losses of $750 million. This compares to $88 million in the year-ago quarter.

For the full-year 2007, "core earnings" net income was $560 million, compared to $1.3 billion in 2006.

111.    Additionally, during the conference call held on January 23, 2008, Defendants made the following admissions concerning the Company's loan loss provisions:

[Lord]: I am sure there are a lot of people in this room that remember that, their credit worthiness, although they may not have been told that at the time, changed dramatically when they got out of college, especially if you went into college – never mind. Graduation is critical. Sallie Mae may have lent too much money to students who have gone to schools without very good graduation records. Such students at such schools are virtually singly responsible for 60% of the '07 credit losses. Our methodology in creating loan loss provisions tended to look backwards. Because that's the information that we had. But we have specifically identified the borrowers who are not likely to graduate and provided for them this quarter, it's a – frankly a different reserving

methodology, but we know those assets are going to default. And so we have reserved for them. Jack will get into far more detail and lay this out in a way that's comprehensible shortly. I believe our long-term charge off numbers will be less than 3% and in fact the relevant numbers for '07 for the assets that we would say are traditional school assets are something less than 2%.

***

Quality assets grew in 2007. They will grow in 2008 and they will grow in 2009 and in 2008 and 2009 they will be far higher quality. The top line is not our issue. The issue is getting the top line to the bottom line and as I have said repeatedly, the issue we are dealing with right now, forget all of '07 events, are cost to funds related and bad debt are related. Cost to funds will improve. The timing of that is not in our hands. Loan losses will also improve. In fact despite the fact that we are staring into the face of what looks to be a deteriorating economy, we believe and I am sure you have heard this a thousand times, we have our arms around this major issue. We expect provision – loan loss provision reductions. We are going to be very careful about that obviously because this economy is – maybe hasn't quite found its way yet but I would hope that as early as mid year 2008 you are seeing that. The company has stopped making loans that were predictably not collectible. You may have seen the announcements. I think three of our major customers and unfortunately what was bad news for us in this quarter has turned out to be very bad news for them as well. You may have seen the announcements that we have notified them that we are just not making those loans anymore.

Jack Remondi - SLM Corporation – CFO

***

Our core earnings for the year totaled $560 million, a 57% decrease on earnings per share to $1.23. This was – the decrease here was primarily driven by the large increase in our loan loss reserve, our provision per loan losses on our private portfolio. Our provision increased by 1.1 billion over 2006.

***

The bulk of the reserve though, was driven by the private credit portfolio with a 961 million increase in the private loan provision. This increase was driven by worst than expected default trends in a

very limited segment of our overall portfolio, it's the portfolio that we will refer to as our nontraditional loans. These are loans that are made to lower tier credit borrowers and are attending, for the most part, schools that have a different profile than other institutions. And mostly due to types of degrees that they offer, more associate versus bachelors and as well as the type of students that attend those institutions. I want to be clear here that it's not a – it's not as easy to say, as I think some people have said, for profit, non-profit, those are not distinctions that adequately describe the areas of concern here. This is really a segment of the schools that for one reason or another are bringing in students but not producing graduates. Or if they are producing graduates their graduates are not earning sufficient – they haven't gained a sufficient economic benefit to generate the earnings to pay off and meet the debt obligations associated with their loan. And that's the business that we will be exiting. Given the deteriorating economic environment and the loss of events for the segment of the portfolio, the fact that the loss segment – the loss events for this segment of the portfolio become more evident earlier in the life cycle of the loan, we took this opportunity to take a look at our reserving methodology and really in effect what's happening is we are recognizing that certain segments of our loan portfolio have loss characteristics more visible to us today. This is really driven by the change in the economic environment as it tends to hit people at the lower tier credit qualities hardest and earliest. We did increase our loss expectations on these types of loans earlier this year but the fourth quarter charge is principally reflective of the earlier loss recognition rather than a significant change in expectations as to gross defaults going forward.

***

Moving on to the private credit portfolio, as we've kind of hinted here, our defaults are highly concentrated, amongst a small set of our borrower population. And in 2007, we experienced a significant decline in the credit quality associated with that segment of the portfolio. These loans today equal about 15% of our managed private credit portfolio, but they generate 60% – or contributed 60% of our total charge offs in 2007. Obviously, a business model that does not make sense. We've taken steps to cease lending activity in these segments of the population and we expect, as Al said in 2008, we will see better loan-loss provisions although because we are looking forward here, higher charge off rates until these loans fully enter the repayment cycle. From our long history, we know that graduation is the key to credit quality in the student loan space. People who generate, who get a degree,

improve their economic and employment prospects materially and thereby generate the means to repay their loans. Our default experience in 2007 supports this, over 65% of our charge offs in 2007 were from borrowers who withdrew early from their program of study or dropped below less than half time status. And that's important because it's the less than half time is the trigger that throws the loan into repayment. This chart shows you how divergent the experience is amongst the different segments of our portfolio. You can see how much higher not only our delinquency rates associated with these loans which run more than six times higher the delinquency rates of our traditional loan portfolios, and these are delinquencies over 90 days. But that they also experience even higher defaults or charge off rates. These loans default at almost eight times the rate that we see in the traditional portfolio.

As a result of the increased provision for loan losses in our nontraditional portfolio, our allowance at year end is a very healthy 37% of the remaining balance of our nontraditional loans in repayment. Combined our allowance for this segment of the portfolio covers more than three times our charge off rates in 2007 which we think was accelerated also due to some operational issues but primarily due to credit and economic factors. And just to be clear, once again with these changes, we would expect the provision in 2008 to decline. We'll see how much that actually improves given the economic environment and how that drives portfolio performance particularly in the remaining portion of this nontraditional loan portfolio. But we do expect charge off rates to continue to rise in the nontraditional segment as this portfolio transitions from the in school status, where charge offs are obviously zero, to the repayment status. And once that portfolio moves into those segments, then we will begin to see the charge off rate decline for that area. We did – before I leave that, we did make some changes in 2007 regarding the underwriting aspects associated with these loans. We implemented programs that delayed the dispersement of loans between 60 and 90 days after enrollment in order to capture early withdrawal events at these institutions and we also implemented, in 2007, some significant risk sharing agreements with students attending certain schools in this category that had those institutions pick up a material portion of what we would expect to be the default exposure on those loans. That would lead one to believe that our 2007 vintage portfolio, as it enters are repayment, will see better default trends than earlier segments of the portfolio but we still believe they represent an unacceptable level of default losses and will – was a factor in why we are exiting this business.

This chart is something that people who follow Sallie Mae would have seen before, but it really is the story associated with education lending. And it bears repeating multiple times, in education, a degree, and the higher that degree, generates higher levels of income and lower levels of unemployment. Those two factors mean our borrowers, by lending to them – the type of lending that we do is to help people generate an improvement in their economic capabilities. And it's that improvement that in turn allows them to meet the debt obligations associated with their loans. If kids don't graduate, it's very difficult. As we saw earlier, 65% of our charge offs came from students who withdrew. It's very difficult to collect on that loan over time. What this chart also shows is that – it helps to prove here, is that our – with our traditional loan portfolio where graduation rates are high, our performance has been exceptional in the past and we expect that to continue going forward. Our charge off rates for this portfolio – the segment of the portfolio which again is 85% of our total managed book is well under 2% in 2007. And we expect those kinds of numbers to continue in that low two's kind of range over the life of the portfolio. Our repayment tools on these loans also help tremendously and help us work with students who have difficulty making repayment. This is where the forbearance tool is such a critical component to managing the ultimate loan performance on our private credit assets. Students generate this higher earnings capability and lower unemployment levels but there are bumps in the road for them. And that's where forbearance comes into place, if they've graduated, they've generated the means they might just have a temporary experience that requires some relief but once they get beyond that, once they get beyond that, once again we can expect repayment on their loans. Clearly for students who withdrew, forbearance is really only an option – a viable option to the extent that we think it's a bridge to getting them back into an – in enrollment status. Without that life becomes very difficult for both of us.

112.    On January 28, 2008, *Reuters* published an article entitled "Sallie Mae, Buyout

Group Settle Lawsuit Over Deal." The article stated in part:

Student-lending company Sallie Mae said on Monday it settled a lawsuit over its failed buyout by a group led by private equity firm JC Flowers and had received $31 billion in new financing.

Sallie Mae, formally known as SLM Corp, dropped its lawsuit and its efforts to seek a $900 million breakup fee from the buyout

group in order to gain the funding to replace $30 billion in interim financing that was due Feb. 15.

Bank of America Corp, JPMorgan Chase and five other banks were providing the new funding. JC Flowers said it would not be obligated to make any payment to Sallie Mae.

"We believe this announcement is a considerable positive given reduced liquidity risk and would expect investors to again focus on SLM's profitability and growth potential," said Lehman Brothers analyst Bruce Harting.

The interim financing had been put in place by Bank of America and JPMorgan, which were part of the buyout group that also included private equity firm Friedman Fleischer & Lowe.

Sallie Mae's buyout crumbled after the Flowers group walked away and claimed that Sallie Mae had suffered a "material adverse change" to its business due to the credit market squeeze and recent legislation that slashes subsidies to student lenders.

Sallie Mae had filed a lawsuit seeking the breakup fee of $900 million, but the buyout group balked at paying any termination fee.

As part of the new financing pact, the lawsuit filed by Sallie Mae over the proposed merger as well as all counterclaims were dismissed and the merger pact was terminated, Sallie Mae said.

"THE RIGHT THING"

"With little chance of recovering any of the $900 million termination fee and the legal expenses involved, we believe the company did the right thing and secured funding – presumably at better terms – as a trade-off," said Matthew Snowling, an analyst at investment group Friedman Billings Ramsey.

"Sallie Mae has long since lost any legal standing on arguing that a material adverse condition had occurred because the company has continued to lower its earnings forecast over time, citing the government's subsidy cut as a reason," Snowling said.

Last week, Sallie Mae posted a fourth-quarter loss due in part to higher provisions for loan losses due to the weakening credit markets.

> Securing the new financing also marks a first crucial win for the company's new chairman, Anthony Terracciano, a veteran banking executive, analysts said. Terracciano, who joined Sallie Mae earlier this month, has worked to stabilize Sallie Mae and restore credibility after the failed merger.
>
> Sallie Mae is expected to pay an interest rate of about 4.5 percent on the 364-day financing package, according to *The New York Times.*
>
> "While there will certainly be a sigh of relief that the credit line has been refinanced, we would echo management's recent comments that it appears costly," said Credit Suisse analyst Moshe Orenbuch.

113.    In order to inflate the price of Sallie Mae's stock, Defendants caused the Company to falsely report its results for year-end 2006 and for the first three quarters of 2007 by failing to adequately accrue its loan loss provisions, which overstated the Company's net income, and by concealing known trends and uncertainties with respect to its non-traditional loan portfolio.

114.    The results for year-end 2006 and for the first three quarters of 2007 were included in Sallie Mae's Form 10-K and Forms 10-Qs filed with the SEC.  The results were also included in press releases disseminated to the public.

115.    These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Sallie Mae's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

116.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(l)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading

and inaccurate, despite footnote or other disclosure.    Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

117.    With respect to accounting for contingencies, GAAP, as set forth in FASB Statement of Financial Accounting Standard (SFAS) No. 5, *Accounting for Contingencies*, ¶8, provides:

> An estimated loss from a loss contingency... shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a.    Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.    The amount of loss can be reasonably estimated.
>
> (Footnote omitted, emphasis in original.)

118.    In violation of GAAP, Sallie Mae failed to provide an adequate reserve for its loan loss provision related to its non-traditional loan portfolio. Despite evidence that the Company was experiencing a high level of delinquency and charge-offs in its non-traditional loan portfolio, the Company failed to provide an adequate reserve for its subprime borrowers attending non-traditional schools.

119.    Ultimately, Salle Mae was forced to take a charge to increase its loan loss provision by $575 million in the fourth quarter 2007 in order to cover actual and expected loan losses.  In total, Sallie Mae's loan provision for 2007 was $1.4 billion compared to $303 million

for 2006. A large portion of the charge was related to loans made by the Company prior to 2007

to subprime borrowers attending non-traditional schools.

120.    Furthermore, during the Class Period, Sallie Mae failed to disclose known trends

and uncertainties concerning its non-traditional loan portfolio in violation of SEC regulations.

121.    Under SEC Regulations, Item 7 of Form 10-K and Item 2 of Form 10-Q,

Management's Discussion and Analysis of Financial Condition and Results of Operations

("MD&A"), require the issuer to furnish information required by Item 303 of Regulation S-K [17

C.F.R. §229.303] ("Item 303"). In discussing results of operations, Item 303 requires the

registrant to:

> Describe any known trends or uncertainties that have had or that
> the registrant reasonably expects will have a material favorable or
> unfavorable impact on net sales or revenues or income from
> continuing operations.

122.    The instructions to paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material
> events and uncertainties known to management that would cause
> reported financial information not to be necessarily indicative of
> future operating results . . . .

123.    In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has

indicated that registrants should employ the following two-step analysis in determining when a

known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item

303:

> A disclosure duty exists where a trend, demand, commitment,
> event or uncertainty is both presently known to management and
> reasonably likely to have a material effect on the registrant's
> financial condition or results of operation.

124.    The MD&A requirements are intended to provide, in one section of a filing,

material historical and prospective textual disclosure enabling investors and other users to assess

the financial condition and results of operations of the registrant, with particular emphasis on the

registrant's prospects for the future.  As Securities Act Release No. 33-6711 notes:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

125.    Item 303 provides:

> To the extent that the financial statements disclose material increases in net sales or revenues, provide a narrative discussion of the extent to which such increases are attributable to increases in prices or to increases in the volume or amount of goods or services being sold or to the introduction of new products or services.
>
> ***
>
> Where the consolidated financial statements reveal material changes from year to year in one or more line items, the causes for the changes shall be described to the extent necessary to an understanding of the registrant's businesses as a whole . . . .

126.    According to Securities Act Release No. 33-6349:

> It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

127.    Nonetheless, in violation of both GAAP and SEC rules, Sallie Mae's Class Period

Forms 10-K and 10-Q failed to disclose known trends and uncertainties related to Sallie Mae's

operations.    Specifically Defendants failed to disclose the following: that the Company was

experiencing higher default and charge-off rates at non-traditional schools than at traditional

schools, that the Company had failed to engage in proper due diligence in making subprime loans

to students attending non-traditional schools and that the Company had failed to provide an adequate loan loss provision for its non-traditional loan portfolio.

128.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use

information about the past to help in assessing the prospects of an enterprise.    Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶95, 97).

129.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by the Plans' participants and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

130.    During the Class Period, as described herein, Defendants knew or should have known that Sallie Mae stock was an imprudent investment for the Plans due to the fact that (a) the Company failed to engage in proper due diligence in originating student loans to subprime

borrowers, particularly those attending non-traditional institutions; (b) the Company had far greater exposure to anticipated losses and defaults related to its non-traditional loan portfolio than it had previously disclosed; (c) the Company was not adequately reserving for uncollectible loans in its non-traditional portfolio; and (d) due to the deterioration in the subprime loans market and reductions in federal subsidies, the Company would be forced to tighten its lending standards on both its federal and private educational loans, which would have a direct material impact on its loan originations going forward.  As a result of these undisclosed facts, Sallie Mae's stock price was artificially inflated making it an imprudent investment for the Plans.

131.    Upon information and belief, Sallie Mae regularly communicated with employees, including Plans' participants, about the Company's performance, future financial and business prospects and Sallie Mae stock.  During the Class Period, upon information and belief, the Company fostered a positive attitude toward Sallie Mae stock as a Plan investment, and/or allowed Plans' participants to follow their natural bias toward remaining invested in the stock of their employer, even after divestiture was possible, by not disclosing negative material information concerning investment in Sallie Mae stock.  As such, Plans' participants could not appreciate the true risks presented by investments in Sallie Mae stock and therefore could not make informed decisions regarding their investments in the Plans.

## CAUSES OF ACTION

### COUNT I

***Failure to Prudently and Loyally
Manage the Plans and Plans' Assets***

***(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)***

132.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

133.    At all relevant times, as alleged above, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

134.    As alleged above, Defendants were all responsible, in different ways and to differing extents, over management of the Plans or disposition of the assets of the Plans and were, during the Class Period, responsible for ensuring that the Plans' investment options, including Sallie Mae Stock Fund, made available to participants in the Plans, were prudent.

135.    Furthermore, under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Thus, Defendants were responsible for ensuring that all investment in Sallie Mae stock under the Plans was prudent, and are liable for losses incurred as a result of such investments being imprudent.

136.    Additionally, pursuant to ERISA, fiduciaries are required to disregard plan documents or directives they know or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, fiduciaries may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

137.    Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

138.    According to the DOL regulations and case law interpreting ERISA § 404, a fiduciary's investment or investment course of action is prudent if:  a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and b) he has acted accordingly.

139.    Again, according to DOL regulations,  "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such  portion of the portfolio:

    o  The composition of the portfolio with regard to diversification;

    o  The liquidity and current return of the portfolio relative to  the anticipated cash flow requirements of the plan; and

    o  The projected return of the portfolio relative to the funding objectives of the plan.

140.    Given the conduct of the Company as described above, Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Sallie Mae stock because, among other reasons:

- Defendants knew of and/or failed to investigate the Company's failure to conduct proper due diligence in originating student loans to subprime borrowers, particularly those attending non-traditional institutions;

- Defendants knew of and/or failed to investigate the undue exposure of the Company's operations to losses and defaults related to its non-traditional loan portfolio;

- Defendants knew of and/or failed to investigate the Company's inadequate reserves for uncollectible loans in its non-traditional portfolio;

- Defendants knew of and/or failed to investigate the fact that due to the deterioration in the subprime loans market and reductions in federal subsidies, the Company would be forced to tighten its lending standards on both its federal and private educational loans, which would have a direct material impact on its loan originations going forward.

- The risk associated with the investment in Sallie Mae's stock during the Class Period was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by the Plans' participants, and Defendants were aware or should have been aware that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it; and

- Knowing of this extraordinary risk, and knowing the participants were not aware of it, Defendants had a duty to avoid permitting the Plans or any participant from investing Plans' assets in Sallie Mae stock.

141.    Defendants breached their duties to prudently and loyally manage the Plans' assets. During the Class Period, Defendants knew or should have known that Sallie Mae stock was not a suitable and appropriate investment for the Plans as described herein. Nonetheless, during the Class Period, Defendants continued to invest the Plans' assets in Sallie Mae stock and to direct and approve the ongoing, automatic investment of the future Company contributions in Sallie Mae stock, instead of other, more suitable, investments. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plans, and indirectly the Plans' participants and beneficiaries, from suffering losses as a result of the Plans' investment in Sallie Mae stock

142.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

143.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants named in this count, are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### *Failure to Provide Complete and Accurate*
### *Information to Participants and Beneficiaries*

### *(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by All Defendants)*

144.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

145.    As alleged above, during the Class Period, all Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

146.    As alleged above, the scope of the fiduciary responsibilities of all Defendants, to differing extents, included disseminating Plans' documents and/or Plan-related information to participants regarding the Plans and/or assets of the Plans.

147.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plans or the Plans' assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans.

148.    This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information regarding the fees paid out by the Plans or the prudence of maintaining investment in the Plans, so that participants can make informed decisions with regard to their investment options available under the Plans.

149.    This fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including potentially illegal conduct, bearing on their retirement savings, but also to forestall such misconduct in the first instance.  By

failing to discharge their disclosure duties, Defendants facilitated the misconduct in the first instance.

150.    Defendants breached their fiduciary duties by (1) failing to provide the Plans participants with complete and accurate information regarding (a) the Company's failure to conduct proper due diligence in originating student loans to subprime borrowers, particularly those attending non-traditional institutions; (b) the Company's exposure to anticipated losses and defaults related to its non-traditional loan portfolio; (c) the Company's inadequate reserves for uncollectible loans in its non-traditional portfolio; and (d) the upcoming changes in the Company's lending standards on both its federal and private education loans; and, (2) by conveying inaccurate information regarding the soundness of the Company's financial health and the prudence of investing retirement contributions in the Company stock.

151.    Had the Defendants not constantly reinforced the safety, stability and prudence of investment in Sallie Mae stock during the Class Period, Plans' participants, to the extent they were permitted, could have divested their holdings of Company stock in the Plans or at least diversified such holdings, thereby mitigating the Plans' losses.

152.    Defendants in this Count are also liable as co-fiduciaries because they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding Sallie Mae stock, despite knowledge of their breaches.  Further, they enabled such conduct as a result of their own failure to satisfy their fiduciary duties and as a result of having knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to Plans' participants, yet not making any effort to remedy the breaches.

153.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, the above-described statements, acts and omissions of the Defendants in this Count constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investing the Plans' assets in Sallie Mae stock, and were material to any reasonable person's decision about whether or not to invest or maintain any part of their retirement assets in Sallie Mae Stock Fund during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of Defendants named in this Count.

154.    Plaintiff further contends that the Plans suffered a loss, and Plaintiff and  the other Class members suffered losses, by the above-described conduct of Defendants named in this Count during the Class Period because that conduct fundamentally deceived Plaintiff and the other Class members about the prudence of making and maintaining retirement investments in Sallie Mae stock, and that, in making and maintaining investments in Sallie Mae stock, Plaintiff and the other Class members relied to their detriment upon the materially deceptive and misleading statements, acts and omissions of Defendants named in this Count.

155.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiff and the other Plans' participants, lost a significant portion of their retirement savings.

156.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

### Failure to Monitor Fiduciaries

### (Breaches of Fiduciary Duties in Violation of ERISA § 404 by Sallie Mae, Defendant Andrews, Defendant Remondi, Defendant Autor, Defendant Masino and the Director Defendants)

157.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

158.    This Count alleges fiduciary breach against the following Defendants: Sallie Mae, Andrews, Remondi, Autor, Masino and the Director Defendants (the "Monitoring Defendants").

159.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

160.     As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other Plan fiduciaries, including the Plan Committee Defendants.

161.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

162.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

163.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

164.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Sallie Mae stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge and unjustified risk of significant investment loss by rank and file employees in their Plan accounts.

165.    In addition, the Monitoring Defendants, in connection with their monitoring and oversight duties, were required to disclose to those they monitored accurate information about the financial condition and practices of Sallie Mae that they indisputably knew or should have known that these Defendant-fiduciaries needed to make sufficiently informed fiduciary investment

decisions.  This is especially true due to the Company's inappropriate business practices, which most, if not all, Monitoring Defendants had direct knowledge of, if not complicity in.  By remaining silent and continuing to conceal such information from the other fiduciaries, the Monitoring Defendants breached their fiduciary duties under the Plan and ERISA.

166.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the monitored defendants, they enabled the breaches by these defendants and they had knowledge of these breaches, yet did not make any effort to remedy the breaches.

167.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

168.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT IV

### *Breach of Duty to Avoid Conflicts of Interest*

### *(Breaches of Fiduciary Duties in Violation of ERISA §§  404 and 405 by All Defendants)*

169.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

170.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

171.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the

interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

172.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occurred by (i) failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plans' investment in Sallie Mae stock and the information provided to participants and beneficiaries concerning it, (ii) failing to notify appropriate federal agencies, including the DOL, of the facts and transactions which made Sallie Mae stock an unsuitable investment for the Plans; (iii) failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served in order to prevent drawing attention to the Company's inappropriate business practices; and (iv) by otherwise placing the interests of the Company and themselves above the interests of the participants with respect to the Plans' investment in Sallie Mae stock.

173.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

174.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants named in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

### COUNT V

#### Co-Fiduciary Liability

#### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by Sallie Mae, Defendant Andrews, Defendant Remondi, Defendant Autor, Defendant Masino and the Director Defendants)

175.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

176.    This Count alleges co-fiduciary liability against the following Defendants: Sallie Mae, Andrews, Remondi, Autor, Masino and the Director Defendants (the "Co-Fiduciary Defendants").

177.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

178.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary Defendants breached all three provisions.

179.    **Knowledge of a Breach and Failure to Remedy**:  ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if it has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach.  Sallie Mae, Defendant Andrews, Defendant Remondi, Defendant Autor, Defendant Masino and the Director Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

180.    Sallie Mae, through its officers and employees, engaged in highly risky and inappropriate business practices, withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to Sallie Mae as a matter of law.

181.    Defendant Andrews, Defendant Remondi, Defendant Autor, Defendant Masino and the Director Defendants, by virtue of their positions at Sallie Mae, participated in and/or knew about the Company's highly risky and inappropriate business practices, and their consequences, including the artificial inflation of the value of Sallie Mae stock.

182.    Because the Defendants named in this Count knew of the Company's improper business practices, they also knew that the Plan Committee Defendants were breaching their duties by continuing to invest the Plans' assets in Sallie Mae stock when it was no longer prudent to do so, and providing incomplete and inaccurate information to Plans' participants. Yet, Sallie Mae, Defendant Andrews, Defendant Remondi, Defendant Autor, Defendant Masino and the Director Defendants failed to undertake any effort to remedy these breaches.

183.    **Knowing Participation in a Breach:** ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Sallie Mae knowingly participated in the fiduciary breaches of the Plan Committee Defendants in that it benefited from the sale or contribution of its stock at artificially inflated prices. Sallie Mae also, as a *de facto* fiduciary, participated in all aspects of the fiduciary breaches of the other defendants. Likewise, Defendant Andrews, Defendant Remondi, Defendant Autor, Defendant Masino and the Director Defendants knowingly participated in the breaches of the Plan Committee Defendants because, as alleged above, they had actual knowledge of the Company's improper and possibly illegal conduct and yet, ignoring their oversight responsibilities, permitted the Plan Committee Defendants to breach their duties.

184.    **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

185.    The failure of Sallie Mae, Defendant Andrews, Defendant Remondi, Defendant Autor, Defendant Masino and the Director Defendants to monitor the Plan Committee Defendants enabled those committees to breach their duties.

186.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement savings.

187.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

<u>CAUSATION</u>

188.    The Plans suffered millions of dollars in losses because a significant percentage of the Plans' assets were imprudently invested or allowed to be imprudently invested by Defendants in Sallie Mae stock during the Class Period, in breach of Defendants' fiduciary duties.  This loss was reflected in the diminished account balances of the Plans' participants.

189.    Defendants are liable for the Plans' losses in this case because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants withheld material, non-public facts from participants, and provided inaccurate and incomplete information to them

regarding the true health and ongoing profitability of Sallie Mae, and its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in the Sallie Mae stock, and Defendants remain liable under ERISA for losses caused by such investment.

190.    Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Sallie Mae stock, eliminating Sallie Mae stock as the primary investment alternative when it became imprudent, and divesting the Plans of their holdings of Sallie Mae stock when maintaining such an investment became imprudent, the Plans would have avoided a substantial portion of the losses that they suffered through their continued investment in Sallie Mae stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

191.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the assets of the Plans should not have been so heavily invested in Sallie Mae equity during the Class Period.

192.    As a consequence of the Defendants' breaches, the Plans suffered significant losses.

193.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan.. …"  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate. …"

194.    With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made

or maintained its investments in the challenged investment and, where alternative investments were available (as they were here, in the equities of other Companies), that the investments made or maintained in Sallie Mae stock would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have been in if the Plans had been properly administered.

195.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and interests on these amounts, as provided by law; and (5) such other legal or equitable relief as may be just and proper.

196.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans

resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had their accounts invested in the common stock of Sallie Mae maintained by the Plans in proportion to the accounts' losses attributable to the precipitous decline in the stock of Sallie Mae equity;

H.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.       An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants, including appropriate modifications to the Plans to ensure against further violations of ERISA.

DATED: May 15, 2008

**HARWOOD FEFFER LLP**

BY:  Robt. Harwood

Robert I. Harwood
Samuel K. Rosen
488 Madison Avenue
New York, New York 10022
Telephone:  (212) 935-7400
Facsimile: (212) 753-3630

Robert B. Weiser
**THE WEISER LAW FIRM, P.C.**
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone: (610) 225-2677
Facsimile: (610) 225-2678

Attorneys for Plaintiff